THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. _____

| | |
|---|---|
| KIM SANDERS BARKER, INDIVIDUALLY, as NEXT OF KIN, and as ADMINISTRATRIX OF THE ESTATE OF MARQUIS BARKER, <br> Plaintiffs. <br><br> v. <br><br> CITY OF BOSTON, <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT AND JURY DEMAND

### I.    INTRODUCTION

This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, and under 42 U.S.C. §§ 1983 and 1988. On November 21, 2007, a diabetic Suffolk County Sheriff Department corrections officer who exhibited clear signs of diminished mental and physical capacity was shot and killed by several officers of the Boston Police Department (the "BPD") after his wife called 911 for help upon witnessing him behaving erratically and threatening to commit suicide. The force employed by the officers of the BPD was excessive under the circumstances and violated the decedent's civil rights where the BPD knew or should have known that the decedent required medical and/or psychiatric help and where he did not pose any substantial threat to the officers or the general public. The City of Boston and the BPD failed to adequately investigate the incident, and failed to properly train, supervise, and discipline the officers who were involved in the use of excessive force.

## II.     JURISDICTION AND VENUE

1.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the case involves claims arising under 42 U.S.C. §§ 1983 and 1988.  The court also has supplemental jurisdiction over the other claims pursuant to 28 U.S.C. § 1367.

2.      Venue in this action lies in this jurisdiction pursuant to 28 U.S.C. § 1391  because the acts described herein were committed in Massachusetts and the parties are located in Massachusetts.

## III.     PARTIES

3.      The Plaintiff, Kim Sanders Barker, is a natural person with a residential address at 238 Fuller Street, Dorchester, MA 02124.   The Plaintiff is the wife of the decedent Marquis Barker ("Barker") and the duly appointed Administratrix of his estate. **Please See** Suffolk County Probate and Family Court Decree of Appointment of Administratrix for Docket No. 08-P-0289-AD1, attached as **Exhibit 1**.

4.      The Defendant, City of Boston (the "City") is a body politic and corporate entity, existing under the laws of the Commonwealth of Massachusetts and located in Suffolk County, Massachusetts with a principal address at One City Hall Square, Boston City Hall, Boston, MA 02201. The City operates the BPD. At all relevant times, the BPD employed  Jeffrey McLean ("Officer McLean"), Henry Doherty ("Officer Doherty"), Daniel Donahue ("Officer Donahue"), Garvin McHale ("Officer McHale"), Claire Duffy ("Officer Duffy"),  Michael Paradis ("Officer Paradis"), Douglas McGrath ("Officer McGrath"), Martin Harrison ("Officer Harrison"), and Sergeant Detective Joseph MacDonald ("Sgt. MacDonald").  At all relevant times each of them where acting within the scope of their employment and under color of state law.

## IV.   FACTS COMMON TO ALL COUNTS

5.      At the time of his death, Barker was a 38 year old African American male.  At all relevant times, Barker suffered from Type II Diabetes and was employed by the Suffolk County Sheriff's Department as a correctional officer.  During his 18 years of service as a correctional officer, Barker had an exemplary record and was known by his co-workers to be both professional and courteous.

6.      On November 21, 2007 at approximately 5:15 pm, Barker's wife, Kim Sanders Barker ("Mrs. Barker"), arrived from work to the couples' home at 238 Fuller Street in Dorchester, MA.  A short time later, Barker also arrived home.  Upon Barker's entry to the home, Mrs. Barker noticed a strange order on his breath and that he was behaving erratically.  When Mrs. Baker attempted to question Barker about his condition, he became agitated and grabbed her by the arm.  Barker then starting foaming at the mouth and his face began twitching.  Barker then began talking to himself and openly expressed a desire to commit suicide.  Shortly thereafter, Barker obtained a black non-lethal pellet gun from the home and staggered outside on to Fuller Street.

7.      While on Fuller Street, Barker continued to behave erratically by walking in a circle in the middle of the street in an unsteady fashion and pointing the pellet gun at his head.  At the same time, he continued to talk to himself and express his desire to shoot himself.

8.      Concerned about her husband's well being, Mrs. Barker dialed 911 for help.  The call was answered by the Massachusetts State Police dispatcher who then forwarded the call to BPD Operational dispatch. Mrs. Barker explained to the BPD dispatcher that her husband was a diabetic, was suffering a mental breakdown, and had grabbed her arm. Mrs. Barker also informed

the BPD dispatcher that her husband was a Suffolk County Sheriff's Department employee and was out on Fuller Street with a pellet gun.

9.      During the telephone conversation with the BPD dispatcher, Mrs. Barker sought assurances from the dispatcher that her husband would not be shot by responding officers. In response, the BPD dispatcher assured her that the officers responding to call would be told that her husband "was not mentally right, [and] that he's having a breakdown."

10.     After speaking with Barker's wife, the BPD dispatcher put a radio call into Charlie 103 which was the call alert assigned to Officer McLean and Officer Doherty. The call was received by Officer McLean. During the radio call, the BPD dispatcher asked Officer McLean to "check an unknown" coming from the State Police for "238 Fuller." The BPD dispatcher further informed Officer McLean that: (1) "[a]pparently it's gonna be a psych [and that]" and that "the subject" is "having a breakdown"; (2) the person in question "works for the Sheriff's Department"; and (3) the person "[is] out in the street with a pellet gun right now." Officer McLean acknowledged receipt of the transmission. However, upon information and belief, Officer McLean did not provide all of these details to his partner, Officer Doherty.

11.     The BPD dispatcher then put out a radio call for more units to "slide in there with [Officers McLean and Doherty]." The call was heard by Officer Donahue and Officer McHale who responded over the radio that they would head over to 238 Fuller Street. At all relevant times, Officer Donahue and Officer McHale were assigned to a marked police cruiser bearing BPD No. 5130 ("Cruiser 5130"). Sgt. MacDonald, the night detective supervisor, also heard the call while seated his desk in the Area B3 station.

12.     At all relevant times, Sgt. MacDonald was aware that the suspect could be armed with a pellet gun and that Officer McLean and Officer Doherty would be responding to a

"psych" and/or "domestic" situation involving an employee of the Suffolk County Sheriff's Department. However, at no time did Sgt. MacDonald attempt communicate to Officer McLean, Officer Doherty, or any other officers responding to the radio call that they should exercise any restraint. Sgt. MacDonald also failed to contact BPD dispatch to request the assistance of a medical or psychiatric professional. Upon information and belief, nor did Sgt. MacDonald attempt to contact the Suffolk County Sheriff's Department to obtain information about one of their employees.

13.    During the above period, the BPD dispatcher received calls from members of the public reporting that there was a "BIG", "DERANGED", "BLACK MAN" on Fuller Street with a gun walking around "YELLING".

14.    A short time later, Officer Donahue and Officer McHale arrived near Barker's location on Fuller Street in their cruiser. Officer Donahue and Officer McHale observed Barker in the middle of Fuller Street behaving erratically by walking in a circle and talking to himself. The officers also observed that Barker did not appear to be steady on his feet and was pointing the pellet gun at his head.

15.    Although Barker's diminished mental and physical capacity was open and obvious, at no time did Officer Donahue or Officer McHale contact BPD dispatch to request medical or psychiatric assistance for Barker or request a crisis negotiator. Instead, the two officers exited their cruiser with their weapons drawn. In doing so, Officer Donahue and Officer McHale left the keys to their cruiser in the ignition with the engine running and doors open. Other BPD units also arrived at the scene, including Officer Duffy, a BPD rookie with only six months of experience. While at the scene, Officer Duffy witnessed Barker point the pellet gun at his head and express his desire to shoot himself.

16.     Meanwhile, back at the Area B3 station, Officer McLean and Officer Doherty were in the process of walking to their own cruiser to head over to Fuller Street to respond to the first call made by BPD dispatch when they heard a BPD unit at the scene "yelling over the radio that a suspect has got a gun." This radio call was also heard by Sgt. MacDonald. In response, Sgt. MacDonald left his desk at the Area B3 station and headed to the site in an unmarked BPD vehicle.

17.     Back at Fuller Street, Officer Donahue and Officer McHale who were now outside Cruiser 5130 with their weapons drawn shouted verbal commands to Barker to drop the gun. At no time did Barker ever point the pellet gun at the officers; rather, Barker pointed the pellet gun at his head and expressed his desire to shoot himself. During this period, Mrs. Barker also arrived at the scene and pleaded with the officers not to shoot her husband.

18.     Barker approached Cruiser 5130 with the pellet gun still pointed at his head. He then entered the vehicle and drove away. Officer Donahue and Officer McHale notified dispatch of the situation. A short time later, Officer McLean and Officer Doherty, and Sgt MacDonald heard an update over the radio that the suspect had "stolen" Cruiser 5130 and was headed in the direction of Morton Street.

19.     Upon Hearing that the suspect had "stolen" Cruiser 5130 and was headed towards Morton Street, Officer McLean and Officer Doherty and Sgt. MacDonald pointed their BPD vehicles in that direction. While on route to Morton Street to look for the suspect in Cruiser 5130, Officer McLean and Officer Doherty were unable contact the other officers to request additional details about the circumstances of the theft of the cruiser and the suspect because the radio in their cruiser was unable to transmit to BPD channel 3.

20.     A short time later, Officer McLean and Officer Doherty observed Cruiser 5130 at the intersection of Fuller and Morton Streets in a stopped position with Barker at the wheel.  As Officer McLean and Officer Doherty positioned their police cruiser closer to Cruiser 5130, the vehicle slowly pulled away taking a turn on to Morton Street in the direction of Norfolk Street intersection. Officer McLean and Officer Doherty then made a u-turn in their own cruiser onto Morton Street and activated the siren and blue strobe lights.

21.     A short time later, four other BPD vehicles joined in the pursuit of Cruiser 5130. The first vehicle to join in the pursuit was a marked cruiser operated by Officer Harrison who had heard the radio transmissions. The second vehicle to join in the pursuit was another marked cruiser operated by Officer Duffy who had witnessed the scene at Fuller Street when Barker pointed the pellet gun at his head.  The third vehicle to join in the pursuit of Cruiser 5130 was an unmarked police vehicle operated by Sgt. MacDonald who had been monitoring the all the radio transmissions.  The fourth vehicle to join the pursuit was an unmarked vehicle operated by Officer Paradis and Officer McGrath who had also heard the radio transmissions.

22.     All five BPD vehicles continued their pursuant of Cruiser 5130 to the Norfolk Street intersection. The roadway in that location was wet and slippery. While attempting to make a left turn, Cruiser 5130 spun out and hit the entry gate to the parking lot of the Walgreens store located at 825 Morton Street in Dorchester, MA.  Cruiser 5130 then came to rest at an angle with the rear side of the vehicle pressed up against the gate.

23.     Officer McLean and Officer Doherty then placed their own cruiser nose to nose with Cruiser 5130 making escape from the parking lot impossible.   Subsequently, Officer McLean and Officer Doherty exited their vehicle with their weapons drawn. At all relevant

times, Barker was sitting in Cruiser 5130 with both hands on the steering wheel in plain view and with the windows rolled up.

24.     Before exiting their police cruiser to confront Barker, Officer McLean and Officer Doherty failed to turn off the loud police siren and bright blue strobe lights.  Both officers then began shouting commands at Barker.  However, because the windows of Cruiser 5130 were rolled up, Officer McLean and Officer Doherty knew or should have known that Barker would not be able to hear any of their verbal commands over the roar of the police siren.

25.     While Officer McLean and Officer Doherty were in the process of approaching Cruiser 5130, the BPD vehicles operated by Officer Harrison, Officer Duffy, Officer McGrath and Officer Paradis, and Sgt. MacDonald also arrived at the Walgreens Parking lot with their sirens blaring and blue lights flashing.  At all relevant times, Officer Harrison, Officer Duffy, Officer McGrath and Officer Paradis, knew that Barker could not escape from the parking lot. Sgt. MacDonald who was the supervising officer on the scene could also see that Barker was boxed in and surrounded by BPD officers.  However, at no time did Sgt. MacDonald make any attempt to de-escalate the situation or contact BPD dispatch to request medical or psychiatric assistance for Barker or ask the dispatcher for a crisis negotiator.  Sgt. MacDonald also failed to order the officers back-off and turn off the load sirens and bright strobe lights in their vehicles so that they could more effectively communicate with Barker.

26.     As Officer McLean and Officer Doherty approached Cruiser 5130, Sgt. MacDonald, Officer Harrison, Officer Duffy, and Officer Paradis observed with their guns drawn.  As officer McLean got closer to Cruiser 5130, Officer Duffy began opening fire on the vehicle without warning or provocation.  Hearing the gunshots, Officer Doherty, Officer

8

McLean, and Officer Harrison also discharged their weapons at the vehicle. Shortly thereafter, Sgt. MacDonald ordered the officers to "cease fire."

27. As a result of the shooting, Barker received gunshot wounds to his head, neck, and arms. Soon thereafter, other BPD units arrived at the scene. The officers removed Barker from the vehicle while he was still alive and handcuffed him. After being removed from the vehicle, Barker was transported to Boston Medical Center by Boston EMS. Barker was pronounced dead at approximately 6:45 pm- some minutes after being shot. The official cause of death stated in the Death Certificate issued by the City of Boston is "gunshot wound to head/neck with perforation of jugular vein." **Please See** Death Certificate, attached hereto as **Exhibit 2**.

28. On April 28, 2008 and again on June 2, 2008, the Plaintiffs served the City with a valid Notices of Tort Claim pursuant to the Massachusetts Tort Claims Act, G.L. c. 258 § 4. **Please See Exhibit 3 and 4**, attached hereto.

29. Prior to his death, Barker was relatively young and otherwise fully capable of working and earning an income.

30. Upon information and belief, the City and the BPD have not provided its officers and supervisors with adequate and specific training in how to effectively respond to a crisis management situation involving members of the public who exhibit clear signs of diminished mental and physical capacity. In addition, upon information and belief, following the events of November 21, 2007, the City and the BPD did not adequately investigate the excessive force utilized by the officers in causing the death of Barker and did not subject any of them to discipline.

**COUNT I**
**SECTION 1983 CLAIM**
*(Kim Sanders Barker, individually, and as the Administratrix of the Estate of Marquis Barker)*

31.     The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 30 of the Complaint as if fully restated herein.

32.     At the time and place above, Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison in the scope of their employment with the City and the BPD were acting under the color of state law.

33.     The force utilized by Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison was excessive and, thus, constituted an unreasonable seizure of Barker and an unlawful deprivation of his life and liberty without due process of law in violation of the Fourth and Fourteenth Amendments to the United States Constitution where: (1) they knew or should have known that Barker showed signs of diminished mental capacity and required medical or psychiatric care; (2) they knew or should have known that Barker was not armed with a lethal weapon; (3) they knew or should have known that non-lethal force could have been used to arrest Barker; and (4) they failed to de-escalate the situation by either withdrawing or using psychological persuasion.

34.     Upon information and belief, the City and the BPD failed to properly train and supervise the officers who engaged in the improper acts described above. Among other things, the City and the BPD: (1) failed to properly train and supervise its officers in how to handle a crisis management situation involving suspects who exhibit signs of diminished mental and physical capacity without causing harm to the suspect; (2) failed to train and properly supervise officers regarding the use of non-lethal force in a crisis management situation; (3) failed to train and properly supervise officers and supervisors regarding the use of psychological persuasion

and/or de-escalation techniques in a crisis management situation; and (4) failed to properly train officers and supervisors on how to effectively disseminate and communicate critical information in a crisis management situation so as to avoid harm to members of the public, including Barker. Therefore, it can be inferred that the City and the BPD have a de-facto policy and custom that condones the use of excessive force in a crisis management situation.

35.     Although the actions of Officer Doherty, Officer Duffy, Officer McLean, Officer Harrison were improper, the City and the BPD failed to adequately investigate and discipline the subject officers engaged in such improper acts. In failing to adequately investigate the incident, discipline the officers, and provide its officers with adequate and specific crisis management training, the City and the BPD by their inaction were indifferent to the constitutional rights of individuals whom the City and the BPD were charged with protecting, including Barker. In addition, the City and the BPD by its actions and omissions has engaged in a pattern and created an atmosphere whereby officers responding to a crisis management situation know that the use of excessive force will be met with approval by police policy makers.

36.     The acts complained of herein and the excessive force used by Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison and condoned by the City and the BPD were objectively unreasonable, unnecessary, and were the natural and probable consequence of the Acts and/or omissions of the City and the BPD.

37.     As a direct and proximate result of the previously described acts and omissions of the City and the BPD, in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution, Barker suffered serious and severe bodily injury which resulted in his death. The City and the BPD ought to have foreseen that death to members of the public, including Barker was likely to result from such acts or omissions.

38.     As a direct and proximate result of the acts and or omissions of the City and the BPD, Barker, while being shot and mortally wounded, was forced to endure conscious pain and suffering, fear, anxiety, and emotional trauma up to the time of his death.

39.     As a direct and proximate result of the such acts and omissions of the BPD in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution, Kim Sanders Barker, individually has suffered great mental pain and anguish and emotional distress, and losses including, but not limited to, his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice.  The Estate of Marquis Barker has been forced to incur funeral and burial expenses.

WHEREFORE, Kim Sanders Barker, individually and as Administratrix of the Estate of Marquis Barker, demands judgment against the City of Boston in an amount that the Court deems just, plus interest, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT II**
**SECTION 1983 CLAIM**
***(Kim Sanders Barker, individually and as the Administratrix of the Estate of Marquis Barker)***

40.     The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 30 of the Complaint as if fully restated herein.

41.     At the time and place above, Sgt. MacDonald in the scope of his employment with the City and the BPD was acting under the color of state law.

42.     Sgt. MacDonald engaged in actions that deprived Barker of his rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution not to be subjected to use of excessive force in that he allowed Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison to discharge their weapons at Barker where: (1) he knew or should have known that Barker showed signs of diminished mental capacity and required medical or psychiatric

care; (2) he knew or should have known that Barker was not armed with a lethal weapon; (3) he knew or should have known that non-lethal force could have been used to arrest Barker; and (4) he failed to de-escalate the situation by ordering the officers to either withdraw or use psychological persuasion.

43.     The City and the BPD failed to properly train and supervise Sgt. MacDonald in how to properly supervise officers responding to a crisis management situation. Therefore, it can be inferred that the City and the BPD have a de-facto policy and custom that condones the use of excessive force in a crisis management situation.

44.     Although the acts or omissions of Sgt. MacDonald were improper, the City and the BPD failed to adequately investigate the incident and discipline Sgt. MacDonald for his role in causing the death of Barker. In failing to adequately investigate the incident and failing to provide field supervisors with adequate and specific training, the City and the BPD by their inaction were indifferent to the constitutional rights of individuals whom the City and the BPD were charged with protecting, including Barker. In addition, the City and the BPD by its actions and omissions has engaged in a pattern and created an atmosphere whereby supervisors responding to a crisis management situation know that the use of excessive force will be met with approval by police policy makers.

45.     As a direct and proximate result of the previously described acts and omissions of the City and the BPD, in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution, Barker suffered serious and severe bodily injury which resulted in his death. The City and the BPD ought to have foreseen that death to members of the public, including Barker, was likely to result from such acts or omissions.

46.    The acts complained of herein and the excessive force permitted by Sgt. MacDonald and condoned by the City and the BPD were objectively unreasonable, unnecessary, and were the natural and probable consequence of the acts and/or omissions of the City and the BPD.

47.    As a direct and proximate result of the negligence of the City and the BPD, Barker, while being shot and mortally wounded, was forced to endure conscious pain and suffering, fear, anxiety, and emotional trauma up to time of his death.

48.    As a direct and proximate result of the such acts and omissions of the BPD in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution, Kim Sanders Barker, individually and as next-of-kin to Barker, has suffered great mental pain and anguish and emotional distress, and losses including, but not limited to, his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice. The Estate of Marquis Barker has been forced to incur funeral and burial expenses.

WHEREFORE, Kim Sanders Barker, as next of kin to and as Administratrix of the Estate of Marquis Barker, demands judgment against the City of Boston in an amount that the Court deems just, plus interest, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT III**
**NEGLIGENCE**
*(Wrongful Death by Kim Sanders Barker, individually, as Next-of-Kin,)*
*and as the Administratrix of the Estate of Marquis Barker)*

49.    The Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 30 of the Complaint as if fully restated herein.

50.    At the time and place above, Officer Doherty, Officer Duffy, Officer McLean and Officer Harrison, while acting in the scope of their employment with the City and the BPD, owed

a duty to Barker to conduct themselves in a reasonable manner in attempting to stop and/or arrest Barker.

51.     Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison breached their duty of care by discharging their weapons at Barker where: (1) they knew or should have known that Barker showed signs of diminished mental capacity and required medical or psychiatric care; (2) they knew or should have known that Barker was not armed with a lethal weapon; (3) they knew or should have known non-lethal force could have been used to arrest Barker; and (4) they failed to de-escalate the situation by either withdrawing or using psychological persuasion.

52.     The acts complained of herein and the excessive force used by Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison were unreasonable, unnecessary, and were the proximate cause Barker's death.

53.     In addition to the above, the intervention of Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison placed Barker in a worse position than he was in before the intervention.

54.     As a direct and proximate result of the negligence of Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison which directly and proximately caused the death of Barker, Kim Sanders Barker, individually and as next-of-kin to Barker, has suffered losses including, but not limited to, his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice. The Estate of Marquis Barker has been forced to incur funeral and burial expenses.

55.     Pursuant to M.G.L. c. 258 § 2, the City is liable for the negligent acts and omissions committed by Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison.

WHEREFORE, Kim Sanders Barker, as next of kin to and as Administratrix of the Estate of

Marquis Barker, demands judgment against the City in an amount that the court deems just,

including any remedies available pursuant to M.G.L. c. 229 §§ 2, 6, plus interest and costs.

### COUNT IV
### NEGLIGENCE
### *(Wrongful Death by Kim Sanders Barker, individually, as Next-of-Kin,)*
### *and as the Administratrix of the Estate of Marquis Barker)*

56.    The Plaintiffs repeat and realign each and every allegation contained in

paragraphs 1 through 30 of the Complaint as if fully restated herein.

57.    At the time and place above, Sgt. MacDonald while acting in the scope of his

employment with the BPD, owed a duty to Barker to conduct himself in a reasonable manner in

his supervision of Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison.

58.    Sgt. MacDonald breached said duty of care by allowing Officer Doherty, Officer

Duffy, Officer McLean, and Officer Harrison to discharge their weapons at Barker where: (1) he

knew or should have known that Barker showed signs of diminished mental capacity and

required medical or psychiatric care; (2) he knew or should have known that Barker was not

armed with a lethal weapon and posed no threat to officers or the general public; (3) he knew or

should have known that non-lethal force could have been used to stop or arrest Barker; and (4)

he failed to de-escalate the situation by ordering the officers to either withdraw or use

psychological persuasion.

59.    The acts complained of herein and the excessive force used by the BPD were

unreasonable, unnecessary, and were the proximate cause Barker's death.

60.    In addition to the above, the BPD's intervention placed Barker in a worse position

than he was in before the intervention.

61.     As a direct and proximate result of the negligence of Sgt. MacDonald which directly and proximately caused the death of Barker, Kim Sanders Barker, individually and as next-of-kin to Barker, has suffered losses including, but not limited to, his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice. The Estate of Marquis Barker has been forced to incur funeral and burial expenses.

62.     Pursuant to M.G.L. c. 258 § 2, the City is liable for the negligent acts and omissions committed by Sgt. MacDonald.

WHEREFORE, Kim Sanders Barker, as next of kin to and as Administratrix of the Estate of Marquis Barker, demands judgment against the City of Boston in an amount that the court deems just, including any remedies available pursuant to M.G.L. c. 229 §§ 2, 6, plus interest and costs.

**COUNT V**
**NEGLIGENCE**
*(Wrongful Death by Kim Sanders Barker, individually, as Next-of-Kin,)*
*and as the Administratrix of the Estate of Marquis Barker)*

63.     The Plaintiffs repeat and realign each and every allegation contained in paragraphs 1 through 30 of the Complaint as if fully restated herein.

64.     At the time and place above, the City and the BPD, owed a duty to Barker to conduct themselves in a reasonable manner in attempting to stop and/or arrest Barker.

65.     The City and the BPD breached their duty to Barker by: (1) failing to properly train and supervise its officers in how to handle a crisis management situation involving suspects who exhibit signs of diminished mental and physical capacity without causing harm to the suspect; (2) failing to train and properly supervise officers and supervisors regarding the use of non-lethal force in a crisis management situation; and (3) failing to train and properly supervise

officers and supervisors regarding the use of psychological persuasion and/or de-escalation techniques in a crisis management situation; and (4) failing to train officers and supervisors on how to effectively disseminate and communicate critical information in a crisis management situation so as to avoid harm to members of the public, including Barker.

66.     The acts complained of herein were unreasonable and were the proximate cause Barker's death.

67.     In addition to the above, the intervention of the City and the BPD placed Barker in a worse position than he was in before the intervention.

68.     As a direct and proximate result of the negligence of the City and the BPD which directly and proximately caused the death of Barker, Kim Sanders Barker, individually and as next-of-kin to Barker, has suffered losses including, but not limited to, his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice. The Estate of Marquis Barker has been forced to incur funeral and burial expenses.

WHEREFORE, Kim Sanders Barker, as next of kin to and as Administratrix of the Estate of Marquis Barker, demands judgment against the City of Boston in an amount that the court deems just, including any remedies available pursuant to M.G.L. c. 229 §§ 2, 6, plus interest and costs.

### COUNT VI
### NEGLIGENCE
*(Conscious Pain and Suffering by Kim Sanders Barker as the Administratrix of the Estate of Barker)*

69.     The Plaintiffs repeat and realign each and every allegation contained in paragraphs 1 through 30 of the Complaint as if fully restated herein.

70.     At the time and place above, Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison, while acting in the scope of their employment with the BPD, owed a duty to Barker to conduct themselves in a reasonable manner in attempting to stop and/or arrest Barker.

71.     Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison breached said duty of care by discharging their weapons at Barker where: (1) they knew or should have known that Barker showed signs of diminished mental capacity and required medical or psychiatric care; (2) they knew or should have known that Barker was not armed with a lethal weapon; (3) they knew or should have known that non-lethal force could have been used to arrest Barker; and (4) they failed to de-escalate the situation by either withdrawing or using psychological persuasion.

72.     Further, at the time and place above, Sgt. MacDonald while acting in the scope of his employment with the BPD, owed a duty to Barker to conduct himself in a reasonable manner in his supervision of Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison.

73.     Sgt. MacDonald breached said duty of care by allowing Officer Doherty, Officer Duffy, Officer McLean, and Officer Harrison to discharge their weapons at Barker where: (1) he knew or should have known that Barker showed signs of diminished mental capacity and required medical or psychiatric care; (2) he knew or should have known that Barker was not armed with a lethal weapon; (3) he knew or should have known that non-lethal force could have been used to arrest Barker; and (4) he failed to de-escalate the situation by ordering the officers to either withdraw or use psychological persuasion.

74.     The City and the BPD breached its duty to Barker by:  (1) failing to properly train and supervise its officers and supervisors in how to handle a crisis management situation

involving suspects who exhibit signs of diminished mental and physical capacity without causing harm to the suspect; (2) failing to train and properly supervise officers and supervisors regarding the use of non-lethal force in a crisis management situation; (3) failing to train and properly supervise officers and supervisors regarding the use of psychological persuasion and/or de-escalation techniques in a crisis management situation; and (4) failing to train officers and supervisors on how to effectively disseminate and communicate critical information in a crisis management situation so as to avoid harm to members of the public, including Barker.

75.     The acts complained of herein and the excessive force used by the BPD were unreasonable, unnecessary, and were the proximate cause Barker's death.

76.     In addition to the above, the BPD's intervention placed Barker in a worse position than he was before the intervention.

77.     As a direct and proximate result of the negligence of the City and the BPD, Barker, while being shot and mortally wounded, was forced to endure conscious pain and suffering, fear, anxiety, and emotional trauma up to time of his death.

WHEREFORE, Kim Sanders Barker, as the Administratrix of the Estate of Marquis Barker, demands judgment against the City of Boston in an amount that the court deems just, including any remedies available pursuant to M.G.L. c. 229 §§ 2, 6, plus interest and costs.

## JURY DEMAND

The Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

KIMBERLY SANDERS BARKER,
INDIVIDUALLY as NEXT OF KIN and as
ADMINISTRATRIX OF THE ESTATE OF
MARQUIS BARKER,

By their attorneys,

/s/ Denzil D. McKenzie
Denzil D. McKenzie, Esq., BBO #336420

/s/ Garrett J. Lee
Garrett J. Lee, Esq., BBO #641876

McKenzie & Associates, P.C.
183 State Street, Suite 6
Boston, MA 02109
Tel.: (617) 723-0400
Fax: (617) 723-7234
Email: *dmckenzie@mckenzielawpc.com*
       *glee@mckenzielawpc.com*

November 18, 2010