UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                         |   |                    |
|-----------------------------------------|---|--------------------|
| KIM SANDERS BARKER,                     ) |   |                    |
| Individually and as                     ) |   |                    |
| Administratrix of the Estate            ) |   |                    |
| of MARQUIS BARKER,                      ) |   |                    |
|                                         ) |   |                    |
|                    Plaintiff,           ) |   |                    |
|                                         ) |   |                    |
|          v.                             ) |   | CIVIL ACTION       |
|                                         ) |   | No. 10-11996-WGY   |
| CITY OF BOSTON and BOSTON               ) |   |                    |
| POLICE COMMISSIONER EDWARD              ) |   |                    |
| F. DAVIS, III, in his Official          ) |   |                    |
| Capacity,                               ) |   |                    |
|                                         ) |   |                    |
|                    Defendants.          ) |   |                    |

YOUNG, D.J.                                                July 5, 2011

## I. INTRODUCTION

Kim Sanders Barker (the "Plaintiff") brings this suit on her own behalf and as Administratrix of the Estate of Marquis Barker ("Barker"), her deceased husband. The Plaintiff alleges that Barker, while suffering from a mental disturbance, was shot and killed by officers of the Boston Police Department. She claims that this shooting was the result of an unconstitutional policy on the part of the City of Boston and Boston Police Comissioner Edward F. Davis, III[1] (collectively, "Boston"). The complaint

---

[1] Commissioner Davis is sued only in his official capacity, so the claim against him is the equivalent of a claim directly against the government entity in question. Brandon v. Holt, 469 U.S. 464, 471-72 (1985). As such, the claims against Commissioner Davis are the same as the claims against Boston.

asserts a federal claim under 42 U.S.C. § 1983 for a violation of Barker's Fourth Amendment right to be free from unreasonable seizures, a state wrongful death claim, a state negligence claim for the conscious pain and suffering of Barker prior to his death, and a state gross negligence claim. Boston has moved to dismiss the complaint in its entirety.

A. **Procedural Posture**

The Plaintiff began this suit on November 18, 2010. ECF No. 1. Boston filed a motion to dismiss the complaint on January 10, 2011. ECF No. 8. The Plaintiff then filed an Amended Complaint on February 7, 2011. ECF No. 12. In March 2011, Boston renewed its motion to dismiss. ECF No. 21.

B. **Facts as Alleged**

1. **Events of November 21, 2007**

In November 2007, Barker was a thirty-eight year-old, African American male who suffered from Type II Diabetes. Am. Compl. ¶ 6. He had been employed as a corrections officer by the Suffolk County Sheriff's Department for eighteen years and had an exemplary record. Id.

On November 21, 2007, when Barker returned home, the Plaintiff noticed a strange odor on his breath and saw that he was behaving strangely. Id. ¶ 7. Barker began foaming at the mouth, his face began twitching, and he began talking to himself, expressing a desire to commit suicide. Id. He retrieved an

unloaded black non-lethal pellet gun from his home and staggered out onto Fuller Street. Id. He walked unsteadily in a circle in the middle of Fuller Street while pointing the pellet gun at his head. Id. ¶ 8. He continued to talk to himself, stating his desire to shoot himself. Id.

The Plaintiff called 911. Id. ¶ 9. She explained to the Boston Police Department's dispatcher that her husband was diabetic, was suffering from a mental breakdown, and had grabbed her arm before leaving the house. Id. She also told the dispatcher that Barker was a corrections officer and had gone out onto Fuller Street with a pellet gun. Id. The dispatcher assured the Plaintiff that the officers responding to the call would be told of her husband's mental state and that he was having a breakdown. Id. ¶ 10.

The dispatcher then issued a radio call to Officer McLean ("McLean") and Officer Doherty ("Doherty"), who were patrolling together. Id. ¶ 11. The dispatcher asked the officers to check on the situation at 238 Fuller Street and informed McLean, who answered the call, that it would "be a psych," that the subject was "having a breakdown," that the subject worked for the Sheriff's Department, and that he was on the street with a pellet gun. Id. McLean did not relay all of this information to Doherty. Id.

The dispatcher also put out a call for additional units to

respond to assist McLean and Doherty. Id. ¶ 12. Officer Donahue ("Donahue") and Officer McHale ("McHale") heard the call and radioed that they would also respond to Fuller Street. Id. Donahue and McHale were driving a marked Boston Police Department Cruiser assigned number 5130 ("Cruiser 5130"). Id. Sergeant MacDonald ("MacDonald") also heard the radio call while at his desk at the District B-3 station. Id. MacDonald made no attempt to communicate with any of the officers responding to the scene; he did not request medical or psychiatric assistance; and he did not attempt to contact the Suffolk County Sheriff's Department. Id. ¶ 13.

McHale and Donahue arrived first at Fuller Street and observed Barker walking unsteadily in a circle in the middle of the street while talking to himself. Id. ¶ 15. The two officers parked Cruiser 5130 within feet of Barker and got out of the cruiser with their weapons drawn. Id. ¶ 16. Another Boston Police Department unit including Officer Duffy ("Duffy"), a rookie officer with only six months experience, arrived on the scene; Duffy got out of her vehicle and pointed her weapon at Barker. Id.

McLean and Doherty were in the process of walking to their cruiser to drive to Fuller Street when they heard a call over the radio that "the suspect [at Fuller Street] has got a gun." Id. ¶ 17. MacDonald also heard this call and left the station to

proceed to Fuller Street in an unmarked vehicle.  Id.

At Fuller Street, Donahue and McHale shouted verbal commands to Barker, who continued to point the pellet gun at his head and express his desire to commit suicide.  Id. ¶ 18.  The Plaintiff arrived at the scene and pleaded with the officers not to shoot her husband.  Id.  She observed that Barker no longer possessed the pellet gun, that his hands were in the air in plain view, and that he appeared confused and disoriented.  Id.

Barker staggered toward Cruiser 5130 and entered the driver's seat of the vehicle.  Id. ¶ 19.  McHale attempted to open the cruiser's door but was unable to stop Barker from driving away.  Id.  Donahue and McHale notified dispatch of the situation; McLean, Doherty, and MacDonald heard over the radio that the suspect had stolen Cruiser 5130 and driven toward Morton Street.  Id.  The three officers drove their vehicles in the direction of Morton street.  Id. ¶ 21.  McLean and Doherty were unable to communicate with the other officers regarding the circumstances of the theft of Cruiser 5130 and the status of Barker because the radio in their cruiser was not functioning properly.  Id.

Shortly later, McLean and Doherty observed Cruiser 5130 stopped at the intersection of Fuller and Morton Streets with Barker at the wheel.  Id. ¶ 22.  As they drove toward Cruiser 5130, it slowly drove away, turning onto Morton Street; McLean

and Doherty followed, activating the flashers and siren of their cruiser. Id. Four other Boston Police Department vehicles joined the pursuit of Cruiser 5130. Id. ¶ 23. Officer Harrison ("Harrison") joined the pursuit after hearing the radio transmissions; Duffy joined the pursuit after witnessing the scene at Fuller Street; MacDonald joined the pursuit after hearing the radio transmissions; and Officers Paradis ("Paradis") and McGrath ("McGrath") joined the pursuit after hearing the radio transmissions. Id.

At the intersection of Morton Street and Norfolk Street, Cruiser 5130, driven by Barker, spun out due to wet conditions and hit an entry gate at the parking lot of a Walgreens store. Id. ¶ 24. The cruiser came to a rest with its rear pressed against the gate. Id. McLean and Doherty stopped their cruiser directly in front of Cruiser 5130, preventing that cruiser from driving away. Id. ¶ 25. Barker was sitting in Cruiser 5130 with both hands in plain view on the steering wheel and the windows rolled up. Id. McLean and Doherty got out of their vehicle with their weapons drawn. Id. The siren and flashers of their cruiser were still activated and the spot light was directed at Barker. Id. ¶ 26. Four other police vehicles carrying Harrison, Duffy, McGrath, Paradis, and MacDonald arrived on the scene; the four vehicles' sirens and flashers were activated. Id. ¶ 27. These additional vehicles surrounded Cruiser 5130, preventing all

6

egress.  Id.

McLean and Doherty approached Cruiser 5130 while MacDonald, Harrison, Duffy, and Paradis observed; all officers had their weapons drawn.  Id. ¶ 28.  Without provocation, Duffy fired her weapon at Cruiser 5130, but did not strike Barker.  Id.  Upon hearing this shot, Doherty, McLean, and Harrison fired their weapons, and Duffy fired her weapon again.  Id.  MacDonald quickly ordered the officers to cease fire.  Id.  Barker had been shot in the head, neck, and arms.  Id. ¶ 29.  The officers removed him from Cruiser 5130 and handcuffed him.  Id.  The only item recovered from Cruiser 5130 was a cellular telephone; no pellet gun was recovered.  Id.

A Boston ambulance transported Barker to the Boston Medical Center, where he was pronounced dead at 6:45 p.m.  Id.  The cause of death was determined to be a gunshot wound to the head and neck which perforated Barker's jugular vein.  Id.

### 2. Boston Policy, Training, and Discipline

In addition to the facts alleged regarding the specific incident at issue here, the Amended Complaint alleges various facts regarding the policies and past practices of the Boston Police Department.

Each year, Boston police officers respond to approximately seven thousand 911 calls involving persons who are mentally ill, emotionally disturbed, or who suffer from diminished mental

7

capacity.  Id. ¶ 34.  Boston police officers respond to these calls in exactly the same way as they respond to other calls. Id.  Boston has "not provided its officers and supervisors with adequate and specific training in how to effectively respond to a crisis management situation involving" mental illness.  Id. ¶ 35.

Boston has issued three rules concerning the use of force: Rule 303 - Use of Deadly Force, Rule 303A - Use of Less Lethal Force, and Rule 304 - Use of Non-Lethal Force.  Id.  None of these rules provide any specific guidelines for handling situations involving individuals who are mentally ill.  Id.

The complaint alleges that Boston knew, prior to the incident involving Barker, that its officers had a history of using excessive force.  Id. ¶ 36.  In 2004, Boston police officers fired paintball rounds into a crowd during unrest following the Red Sox World Series victory, killing Victoria Snelgrove ("Snelgrove").  Id.  In 1992, a Boston police officer, responding to a call for assistance to bring Nathan Hersh ("Hersh") to pyschiatric care, instead provoked a confrontation, then shot and killed Hersh.  Id.  In 2004, two Boston police officers shot and killed Luis Gonzalez ("Gonzalez") inside his apartment despite knowing that he suffered from mental and psychological problems.  Id.

In February 2011, the Boston City Council issued an order to hold "a hearing to examine the policies and procedures regarding

emergency response to individuals experiencing mental health crises." Id. ¶ 37. This order for a hearing was premised on the assertion that "first responder response to an individual experiencing a mental health crisis may result in arrest, incarceration, and possibly injury, when treatment and referral may be the appropriate course of action." Id.

In 1992, a commission initiated by former Boston Mayor Raymond Flynn issued a report (the "St. Clair Commission Report") finding substantial problems in the Boston Police Department's procedures for investigating and responding to complaints of officer misconduct. Id. ¶ 38. The St. Clair Commission Report recommended major changes to the investigatory policies, but little was changed. Id. ¶¶ 38-39. An oversight panel also reviewed the Boston Police Department's internal investigatory procedures and found them lacking. Id. ¶ 41.

Following the shooting of Barker, the Plaintiff alleges that Boston did not adequately investigate the use of force by the officers. Id. ¶ 42. The investigation was purely formalistic and led to perfunctory conclusions. Id. Boston took no action to discipline any of the officer involved in the shooting of Barker. Id. ¶ 43. Instead, Boston awarded Duffy, Donahue, McHale, Harrison, McLean, and Doherty the Medal of Honor for their actions. Id.

## C. Federal Jurisdiction

Since the Amended Complaint includes claims for violations of Barker's Fourth and Fourteenth Amendment rights as made actionable by 42 U.S.C. § 1983, this civil rights case arises under federal law, and the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## II. ANALYSIS

### A. Legal Standard

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A mere recital of the legal elements supported only by conclusory statements is not sufficient to state a cause of action. Id. at 555.

### B. Section 1983 Municipal Liability and Excessive Force

Pursuant to the Supreme Court's decision in Monell v. Department of Soc. Servs., 436 U.S. 658 (1978), a municipality is not liable under section 1983 for the actions of its agents under a theory of respondeat superior. Id. at 691-94. Instead, in order to hold the city liable under section 1983, the Plaintiff must establish that Boston had an unconstitutional official

policy or custom that caused the death of Barker. <u>Id.</u> at 690. Here, the Plaintiff argues for the existence of such a policy using two theories: that Boston failed properly to train its police officers and that Boston failed properly to discipline officers who used excessive force. The Court addresses each of these theories in turn.

### 1. Failure to Train

First, the Plaintiff argues that Boston failed adequately to train its officers in how to identify situations that involve mentally ill individuals and safely handle those situations. <u>See</u> Pl.'s Opp'n 4-14, ECF No. 26. In order to sustain her claim for municipal liability under a failure to train theory, the Plaintiff must demonstrate that "the failure to train amount[ed] to deliberate indifference to the rights of persons with whom the police come into contact" and that "the identified deficiency in a city's training program [is] closely related to the ultimate injury." <u>Young</u> v. <u>City of Providence</u>, 404 F.3d 4, 26 (1st Cir. 2005) (quoting <u>City of Canton</u> v. <u>Harris</u>, 489 U.S. 378, 388-91 (1989)). "The liability criteria for 'failure to train' claims are exceptionally stringent . . . ." <u>Hayden</u> v. <u>Grayson</u>, 134 F.3d 449, 456 (1st Cir. 1998).

#### a. Deliberate Indifference

For the first element, the Amended Complaint offers mostly conclusory statements regarding Boston's inadequate training on

11

how to deal with mentally ill individuals.  See, e.g., Am. Compl.
¶ 35.  The Plaintiff identifies Boston Police Department rules
concerning the use of force and alleges that they do not address
mental illness at all.[2]  Id.  The Amended Complaint mentions two
previous incidents in which a mentally ill individual was killed
by Boston police officers, one incident occurring in 1992 and one
in 2004.  Id. ¶ 36.  It also makes reference to an order issued
by the Boston City Council to hold hearings on the Boston Police
Department's procedures for responding to emergencies involving
mentally ill individuals.  Id. ¶ 37.

These allegations fall short of the requisite showing that
Boston had a policy that was "deliberately indifferent" to the
constitutional rights of mentally ill individuals.  See Board of
Cnty Comm'rs v. Brown, 520 U.S. 397, 409 (1997).  The Plaintiff
must show that Boston ignored a known or obvious risk of a highly
predictable severe harm.  Id.; Young, 404 F.3d at 28.  Based on
the events that transpired in this case, the Plaintiff must show

---

[2] Boston responds to the Plaintiff's claims that it does not
train its officers regarding mental illness by submitting to the
Court a copy of Boston Police Department Rule 200: Critical
Incident Management.  See Mem. L. Supp. Defs.' Mot. Dismiss 9 &
n.3, ECF No. 20.  Boston argues that the Court can properly
consider this document at this stage because the Amended
Complaint referred to other Boston Police Department Rules.  See
id. at 9 n.3; Am. Compl. ¶ 35.  The Plaintiff objects to the
Court considering this evidence outside the complaint.  See Pl.'s
Opp'n 6 n.4.  Because the Court holds that the Plaintiff's
allegations of inadequate training must fail, even without
consideration of Rule 200, it need not decide the propriety of
considering that rule.

that Boston was deliberately indifferent to a known risk that its officers would use excessive force against a mentally ill individual.

The facts in the Amended Complaint themselves refute any such showing. Each year, the Boston police respond to seven thousand calls involving mentally ill individuals. Am. Compl. ¶ 34. Yet, from 1992 to the present, the Plaintiff identifies only two incidents in which Boston police officers killed a mentally ill individual. See id. ¶ 36. Thus, over the course of nineteen years, or approximately 133,000 calls involving a mentally ill person, only two were killed by police officers. Moreover, the Plaintiff does not allege that the use of force in either of those two prior incidents was excessive.

Such evidence cannot support the conclusion that Boston was deliberately indifferent to an obvious risk that its officers would use excessive force against mentally ill individuals. The minimal nature of these alleged facts is not saved by the allegations regarding the City Council's order to hold a hearing. The mere decision to hold a hearing on the issue of police responses to incidents involving mental illness sheds no light on the practices or policies of Boston. Thus, the Court holds that the Amended Complaint does not allege facts sufficient to establish a plausible claim that Boston had an unconstitutional policy of failing to train its officer regarding mental illness.

### b. Causation

Additionally, the Plaintiff's alleged facts do not support the second element, causation. The Amended Complaint alleges that Barker was shot while he was sitting unarmed with his hands visible on the steering wheel of a car that was incapable of moving because it was completely surrounded by police cars. Id. ¶ 25, 27-28. It alleges that Duffy, a relatively inexperienced officer, opened fire on Barker without provocation and that three other officers immediately followed suit. Id. ¶ 28.

Although the Amended Complaint is replete with commentary on how officers earlier in the night did not act properly in light of Barker's mental condition, no allegation is made that Duffy or any of the other officers' decisions to fire their weapons was in any way related to any mental illness that Barker may have suffered. The Amended Complaint simply alleges that four officers approached, fired their weapons at, and killed an unarmed, non-threatening, harmless individual without provocation. If proven, this would be an extreme case of the use of excessive force, but from the alleged facts, no reasonable jury could infer that further training by Boston regarding dealing with mental illness could have prevented this shooting.

Even assuming, arguendo, that officers earlier in the night might have handled Barker's situation more adeptly had they been more thoroughly trained on dealing with mental illness, it was

14

completely unforeseeable at the time of the initial confrontation on Fuller Street that another officer would later shoot an unarmed and non-threatening Barker without provocation. The facts alleged in the Amended Complaint simply fail to establish a causal nexus between any alleged deficiency of training regarding handling mentally ill individuals and the shooting of Barker.

Indeed, the alleged facts would seem more directly to support a claim that Boston was deficient in training its officers in the use of force in any situation. But such a contention - which, in any case, the Plaintiff does not make - is belied by the Amended Complaint itself, which acknowledges the existence of detailed guidelines for the use of force by Boston police officers and offers no indication that those guidelines were defective in any way. See id. ¶ 35 (discussing Boston Police Department Rules 303, 303A, and 304).

As pled, the Amended Complaint fails to allege concrete facts supporting its conclusory statement that Boston's training of its officers regarding mental illness was constitutionally deficient. Nor does it allege any facts that could support a conclusion that Boston's allegedly deficient training regarding mentally illness was the cause of the shooting of Barker. Accordingly, the Court holds that the Amended Complaint does not state a claim for a violation of Barker's Fourth Amendment rights under a failure to train theory.

15

## 2. Failure to Discipline

Second, the Plaintiff argues that Boston's failure to discipline the officers involved in the shooting of Barker and past deficiencies in the investigation of uses of force by officers demonstrate that Boston had a policy of condoning the use of excessive force. Pl.'s Opp'n 14-15.

In order to establish liability under a failure to discipline theory, the Plaintiff must show a persistent failure to discipline that demonstrates the existence of a custom or policy of Boston. See Burke v. Town of Walpole, No. 00-10376, 2003 WL 23327539, at *13 (D. Mass. Aug. 5, 2003) (O'Toole, J.) (collecting cases). A single failure to discipline is not sufficient to establish municipal liability under Monell. Oklahoma v. Tuttle, 471 U.S. 808, 823-24 (1985); Burke, 2003 WL 23327539, at *13.

Here, besides allegations regarding the insufficiency of the investigation of Barker's shooting, see Am. Compl. ¶¶ 42-43, the Amended Complaint offers no other specific incidents in which Boston failed to discipline officers who used excessive force. Although the Amended Complaint mentions three prior incidents in which Boston police officers used lethal force, it alleges neither that these uses of force were excessive nor that the officers involved were not disciplined. As such, these prior

16

incidents provide no support for the assertion that Boston has a policy of not disciplining officers who use excessive force.

The Amended Complaint also notes two reports concerning the Boston Police Department's internal investigations.  First, it discusses the 1992 St. Clair Commission organized by former Boston Mayor Raymond Flynn and alleges that the report of that commission "found among other things, a hearing process characterized by shoddy, halfhearted investigations, lengthy delays, and inadequate documentation and record-keeping." Id. ¶ 38.  Second, it discusses a Community Ombuds Oversight Panel that reviewed internal affairs investigations that took place in 2007.  That panel found deficiencies in the manner in which Boston investigated and responded to complaints against its police officers.  Id. ¶ 41.

The Amended Complaint does not, however, allege that either of these reports concluded that Boston did not discipline officers who engaged in the excessive use of force.  Even were the Plaintiff able to demonstrate at trial that Boston's internal investigations of police misconduct were deficient, it would be unwarranted speculation to infer that lax investigations created a policy of condoning the excessive use of force.  Absent allegations of incidents in which Boston police officers used excessive force but were not disciplined or other concrete, non-

conclusory allegations of the existence of a policy of not disciplining officers who used excessive force, this theory of municipal liability must fail.

Although they describe a tragic incident, the factual allegations in the Amended Complaint simply do not match the claims advanced by the Plaintiff.  None of the facts pleaded in the complaint support an inference that Boston's alleged failure to train police officers regarding the handling of mentally ill individuals caused the shooting of Barker.  Moreover, no facts alleged could support a conclusion that Boston persistently failed to discipline officers who used excessive force, thereby creating a de facto policy condoning the use of excessive force.  Because the Amended Complaint does not support either of these theories of municipal liability, the Plaintiff fails to state a plausible section 1983 claim against Boston.

### III. CONCLUSION

For the foregoing reasons, Boston's motion to dismiss, ECF No. 21, is allowed as to Count I of the Amended Complaint.  Out of respect for the courts of the Commonwealth of Massachusetts, this Court declines to exercise supplemental jurisdiction over Counts II, III, and IV, which implicate only issues of Massachusetts law.  See 28 U.S.C. § 1367(c)(3).  Those claims are dismissed without prejudice to their being brought in the

Massachusetts Superior Court sitting in and for the County of Suffolk.

SO ORDERED

                                    /s/ William G. Young
                                    William G. Young
                                    District Judge